# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 23
Kevin Grady,
  Appellant,
   v.
Chenango Valley Central School
District et al.,
  Respondents.
----------------
No. 24
Joanne Secky, &c.,
  Appellant,
   v.
New Paltz Central School District
et al.,
  Respondents.

Case No. 23:

Robert A. O'Hare, Jr., for appellant.
Giancarlo Facciponte, for respondents.
New York State Trial Lawyers Association, amicus curiae.

Case No. 24:

Steven A. Kimmel, for appellant.
Christopher K. Mills, for respondents.

GARCIA, J.:

Since the enactment of the comparative fault regime of CPLR article 14 in 1975, this Court has retained a form of the primary assumption of risk doctrine, applicable only in a narrow set of circumstances, in recognition of the fact that "athletic and recreative activities possess enormous social value, even while they involve significantly heightened risks" (*Trupia v Lake George Cent. School Dist.*, 14 NY3d 392, 395 [2010]). Both

plaintiffs here seek to recover for injuries sustained during organized sports practices for high school athletic teams, and appeal from orders granting defendants' motions for summary judgment. Application of this well-established assumption of risk doctrine to these two cases produces different outcomes: in *Secky*, we affirm the order of the Appellate Division granting summary judgment, and in *Grady*, we reverse because material questions of fact remain.

I.

The primary assumption of risk doctrine,[1] as articulated by Judge Cardozo, is based on the premise that " '[o]ne who takes part in . . . a sport accepts the dangers that inhere in it so far as they are obvious and necessary' " (*Morgan v State of N.Y.*, 90 NY2d 471, 482-483 [1997], quoting *Murphy v Steeplechase Amusement Co.*, 250 NY 479, 482-483 [1929]). Enactment of a comparative negligence standard in 1975, however, required this Court to reexamine the "fit," or "continued viability," of this long-standing common law assumption of risk doctrine (*see Morgan*, 90 NY2d at 483). The relevant statute provides that "[i]n any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused

---

[1] "[A]s the term [assumption of risk] applies to sporting events it involves what commentators call 'primary' assumption of risk" (*Turcotte v Fell*, 68 NY2d 432, 438 [1986]).

the damages" (CPLR 1411). Though we have acknowledged that the assumption of risk doctrine may not "sit comfortably" within the landscape of comparative fault, it remains in full force in the limited context of athletic and recreative activities (*Trupia*, 14 NY3d at 395).

Our justification for retaining the doctrine in these circumstances is clear: because "athletic and recreative activities possess enormous social value, even while they involve significantly heightened risks," we have "employed the notion that these risks may be voluntarily assumed to preserve these beneficial pursuits as against the prohibitive liability to which they would otherwise give rise" (*id.* at 395; *see Custodi v Town of Amherst*, 20 NY3d 83, 87 [2012] [continued application of the assumption of risk doctrine "fosters these socially beneficial activities by shielding coparticipants, activity sponsors or venue owners from 'potentially crushing liability' "], quoting *Bukowski v Clarkson Univ.*, 19 NY3d 353, 358 [2012]). At the same time, we are mindful that "application [of the assumption of risk doctrine] must be closely circumscribed if it is not seriously to undermine and displace the principles of comparative causation that the Legislature has deemed applicable to '*any* action to recover damages for personal injury, injury to property, or wrongful death' " (*Trupia*, 14 NY3d at 395-396, quoting CPLR 1411 [emphasis in original]). Accordingly, assumption of risk in this context "is no longer treated as a defense to the abandoned contributory negligence equation" (*Morgan*, 90 NY2d at 485). Rather, the doctrine defines "the standard of care under which a defendant's duty is defined and circumscribed 'because assumption of risk in this form is really a *principle of no duty,* or no negligence and so *denies the existence of any underlying cause of action*' " (*id.*, quoting Prosser and

Keeton, Torts § 68 at 496-497 [5th ed 1984]; *see Trupia*, 14 NY3d at 395 [doctrine "limit(s) duty through consent—indeed it has been described as a 'principle of no duty' rather than an absolute defense based upon a plaintiff's culpable conduct"]).

In these limited circumstances, "primary assumption of the risk applies when a consenting participant in a qualified activity 'is aware of the risks; has an appreciation of the nature of the risks; and voluntarily assumes the risks' " (*Custodi*, 20 NY3d at 88, quoting *Bukowski*, 19 NY3d at 356; *see Turcotte v Fell*, 68 NY2d 432, 439 [1986] [where "the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty"]). Moreover, "[i]t is not necessary to the application of assumption of risk that the injured plaintiff have foreseen the exact manner in which his or her injury occurred, so long as he or she is aware of the potential for injury of the mechanism from which the injury results" (*Maddox v City of New York*, 66 NY2d 270, 278 [1985]). A participant is not, however, deemed to have assumed "risks that are concealed or unreasonably enhanced" (*Custodi*, 20 NY3d at 88; *see Bukowski*, 19 NY3d at 356). The two cases we consider here provide an opportunity to apply these principles in the context of two quite different organized practice drills for high school athletic teams.

We reject the dissent's entreaty to abandon decades of applicable precedent that has been so frequently, and so recently, reaffirmed (*see Turcotte*, 68 NY2d 432 [reaffirming approach in 1986]; *Benitez*, 73 NY2d 650, 657 [1989] [same in 1989]; *Morgan*, 90 NY2d 471 [same in 1997]; *Trevett v City of Little Falls*, 6 NY3d 884, 885 [2006] [same in 2006]; *Trupia*, 14 NY3d 392 [same in 2010]; *Bukowski*¸19 NY3d 353 [same in 2012]). "Even

under the most flexible version of the doctrine [of stare decisis], prior decisions should not be overruled unless a 'compelling justification' exists for such a drastic step" (*State Farm Mut. Auto. Ins. Co. v Fitzgerald*, 25 NY3d 799, 819 [2015]); *see also Palladino v CNY Centro, Inc.*, 23 NY3d 140, 151 [2014] [considering "the Legislature's competency to correct [judicial] misinterpretation" as a factor in favor of adhering to precedent]).  Our stare decisis doctrine does not permit overturning precedent merely because "it's time" (dissenting op at 1).[2]  Nothing more than the dissent's unsupported assertion that "the policy concerns that animated the Court's jurisprudence have proven unfounded" and references to "experience [that] teaches us that a policy driving our case law is unjustified"—without explanation of what that experience is—are provided to meet this significant burden (dissenting op at 7, 24 n 12).[3]  Instead of providing a "compelling justification," the dissent summarily characterizes nearly 50 years of precedent as a

_____

[2] The dissenting opinion's reliance on the experience of other jurisdictions is less than compelling, since only two of eight cited cases involve circumstances in which this Court would apply the assumption of risk doctrine to bar recovery.  Moreover, the dissenting opinion provides no support for its claim that the experience of other jurisdictions allowing for liability under these circumstances has shown that "the fear of 'potentially crushing liability' on school athletics has no basis in reality" (dissenting op at 23).  The record before us is bereft of evidence that states opting to allow for liability in similar circumstances have not seen any cuts to scholastic sports budgets or even a chilling effect on employment in athletics in decades (dissenting op at 23 n 11), nor do we know what sorts of other limitations on liability and damages those states may impose.

[3] By comparison, the cases cited in the dissenting opinion as instances where the Court has "correct[ed] our mistaken interpretations of statutes" provide useful examples of the detailed analysis and compelling justification that must drive a decision to abandon decades of precedent (dissenting op at 24 n 12).

misinterpretation of CPLR 1411 (dissenting op at 2)—albeit one that the legislature has never sought to "correct."

## II.

In *Secky*, the primary assumption of risk doctrine applies, and we affirm the Appellate Division order granting defendants' motion for summary judgment. Plaintiff, who had played basketball at the highest amateur student level, was injured during a drill in which the players competed to retrieve a rebound. Plaintiff's coach had explained that the boundary lines of the court would not apply during the drill and that only major fouls would be called. At the time of the drill, bleachers stationed near the court were retracted. Plaintiff was injured when, pursuing a loose ball from the top of the key towards the bleachers, another player collided with him, causing plaintiff to fall into the bleachers and sustain an injury to his right shoulder. Plaintiff, through his mother, sued the coach and the school district, and defendants moved for summary judgment.

Supreme Court denied defendant's motion because of conflicting expert testimony, and the Appellate Division reversed (195 AD3d 1347 [3d Dept 2021]). The Appellate Division majority held that elimination of the boundary lines during the drill "did not unreasonably increase the inherent risks of the drill or playing basketball," and so plaintiff did not satisfy his burden on summary judgment (*id.* at 1349). One Justice dissented, asserting that "whether the elimination of boundaries and the relaxation of foul calls unreasonably enhanced the risk of the drill in this situation is . . . a question of fact to be determined by a jury" (*id.* at 1350).

We now affirm because plaintiff's injury is one inherent in the sport of basketball and so he assumed the risk of the injury he sustained. We have, in fact, previously held that "the risk of collision [with an open and obvious item near a basketball court] was inherent in playing on that court" and so plaintiff had assumed the risk of that injury (*Trevett*, 6 NY3d at 885). "[A]lthough the assumption of risk to be implied from participation in a sport with awareness of the risk is generally a question of fact for a jury, dismissal of a complaint as a matter of law is warranted when on the evidentiary materials before the court no fact issue remains for decision by the trier of fact" (*Maddox*, 66 NY2d at 279). Here, no such fact issue remains. The drill assigned to plaintiff and his teammates did not unreasonably increase the risk of injury beyond that inherent in the sport of basketball, and the Appellate Division properly granted defendants' motion for summary judgment.

### III.

In *Grady,* by contrast, material issues of fact remain to be resolved by a jury. Plaintiff, a senior on the Chenango Valley High School varsity baseball team, was injured during his participation in a fast-moving, intricate drill. The drill involved two coaches hitting balls to players stationed in the infield, with one coach hitting to the third baseman, who would then throw to first base, while another coach hit to the shortstop, who would throw to the second baseman who would, in turn, throw to a player at "short first base," positioned a few feet from regulation first base. Because the drill required baseballs from two parts of the infield to be thrown to two players in the same area by first base, the coaches had positioned a protective screen, measuring seven by seven, between the

regulation first baseman and the short first baseman. Plaintiff, in the group of players assigned to first base, was injured when an errant ball, intended for the short first baseman, bypassed the short first baseman and the protective screen and hit him on the right side of his face, causing serious injury to his eye including significant vision loss. Plaintiffs sued his coaches and the school district, and defendants moved for summary judgment.

Supreme Court granted defendants' motion for summary judgment, finding that plaintiff was aware of the drill's risks and his "awareness here was specifically related to this activity, the multiple ball drill which he had played on previous occasions and his specific awareness of errant throws immediately prior to this accident." Accordingly, the court concluded that "plaintiff has failed to prove that he was faced with a risk that was unassumed, concealed or unreasonably increased and has failed to raise a triable issue of fact."

The Appellate Division affirmed, holding that "the evidence showed that plaintiff was an experienced baseball player who knew of the risks, appreciated their nature and voluntarily assumed them, defendants demonstrated their prima facie entitlement to summary judgment under the primary assumption of risk doctrine," and "plaintiff failed to raise a triable question of fact" in response (190 AD3d 1218, 1220-1221 [3d Dept 2021]). The majority concluded that "[h]aving more than one ball in play may not be an inherent risk in a traditional baseball game, but the record indicates that it is a risk inherent in baseball team practices" and that the small screen did not make the drill unreasonably dangerous because of plaintiff's "testimony unequivocally establishing that he did not rely upon the screen for safety but, rather, thought that the drill was unsafe even in the presence

of the screen" (*id.* at 1220). One Justice dissented on the basis that a question of fact existed regarding the adequacy of the protective screen, while another Justice dissented because "a jury should be permitted to make the determination as to whether the drill was sufficiently related to the sport of baseball and whether it posed an unreasonable risk of harm" (*id.* at 1221-1228). We now reverse.

Defendants have not shown that, as a matter of law, plaintiff's injury was sustained as a result of the inherent risk of baseball, or even due to "suboptimal playing conditions" (*Bukowski*, 19 NY3d at 357). Instead, plaintiff has raised triable questions of fact regarding whether the drill, as conducted here and with the use of the seven-by-seven-foot screen, "was unique and created a dangerous condition over and above the usual dangers that are inherent" in baseball (*Owen v R.J.S. Safety Equip.*, 79 NY2d 967, 970 [1992]), and whether plaintiff's awareness of the risks inherent in both the game of baseball and the practices that are a necessary part of participation in organized sports encompassed the risks arising from involvement in the drill performed here. Under these unique circumstances, because of the way this drill, with multiple balls in play directed to the same part of the field and with only a relatively small protective screen positioned in front of the first baseman, was conducted, we cannot say that, as a matter of law, the conditions of play were "as safe as they appear[ed] to be" (*Turcotte*, 68 NY2d at 439). While "[t]he line to be drawn and applied in this case is close, . . . plaintiffs have the better of it" (*Morgan*, 90 NY2d at 488). Errant balls may be an inherent risk of playing baseball, but a jury should be permitted to determine whether plaintiff's injury was the result of such an inherent risk, or whether "the risks [were] concealed or unreasonably enhanced" by the complexity of the drill performed

with use of a small protective screen (*Custodi*, 20 NY3d at 88; *see Bukowski*, 19 NY3d at 356).

*          *          *

Accordingly, in *Secky*, the order of the Appellate Division should be affirmed, with costs.  In *Grady*, the order of the Appellate Division should be reversed, with costs, and defendants' motion for summary judgment denied.

RIVERA, J. (concurring in *Grady* and dissenting in *Secky*):

It's time we correct the errors of the past and abandon the implied assumption of risk doctrine that the Court has retained despite the Legislature's unequivocal abolition of contributory negligence and assumption of risk as complete defenses. New York is a comparative fault jurisdiction. Under that tort rule, the question of a defendant's liability

should be submitted to the trier of fact with an appropriate charge on comparative culpability so that any damage award may be assigned based on each party's fault, in accordance with CPLR Article 14-A. Therefore, the Appellate Division orders in the respective appeals before us should be reversed and the cases decided at trial because the defendants' liability cannot be resolved on summary judgment. Although the majority reaches the correct outcome in *Grady*, it does so by applying several of the Court's prior holdings that misinterpreted CPLR 1411's plain text and thereby diminished the statute's intended purpose. Under CPLR 1411, assumption of risk is a basis to reduce the plaintiff's damage award, not to bar relief from injuries caused by a defendant's tortious conduct.

## I.

In 1975, the Legislature adopted a comparative fault regime, expressly abolishing "contributory negligence and assumption of risk as absolute defenses" (*Trupia v Lake George Cent. School Dist.*, 14 NY3d 392, 394 [2010]). Specifically, CPLR 1411 provides that

> "[i]n any action to recover damages for personal injury, injury to property, or wrongful death, *the culpable conduct attributable to the claimant* or to the decedent, *including contributory negligence or assumption of risk, shall not bar recovery*, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the

claimant or decedent bears to the culpable conduct which caused the damages" ([emphasis added]).

In accordance with our established rules of interpretation, we are bound to "ascertain and give effect to the intention of the Legislature" (McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a], at 177), and the best evidence of that intent is the text as written, giving it its plain meaning (*People v Cahill*, 2 NY3d 14, 117 [2003] [citing *Riley*, 95 NY2d at 463]; *see also People v Galindo*, 38 NY3d 199, 203 [2022]). On its face, the text sounds the death knell of contributory negligence and assumption of risk's per se rule disallowing recovery by a plaintiff who shared some percentage of negligence in causing the underlying harm (*see Arbegast v Board of Educ. of S. New Berlin Cent. School*, 65 NY2d 161, 165 [1985]; *Fitzpatrick v International Ry. Co.*, 252 NY 127, 134 [1929] ["'(T)he slightest contributory negligence upon the part of the plaintiff, no matter how or by whom it may be proven, bars recovery, establishes that there is and was no cause of action, no right to damages"]).

Indeed, legislative history reveals a shared intent among all three branches of the government to abolish assumption of risk as an absolute bar to recovery—whether conceived as a measure of the defendant's duty or as a defense to a breach of that duty. In the mid-1970s, members of the judiciary familiar with the assumption of risk doctrine first proposed in a Judicial Conference Report the enactment of CPLR 1411 as part of a broader legislative package and commented on the tendency of the doctrine's emerging 'no-duty' rationale to devolve into a de facto bar to recovery. The report observed that "[o]n occasion, a New York court has taken the position that assumption of risk is not a mere defense to

an action for negligence, but actually negates any duty owed by the defendant to the plaintiff," and cautioned that endorsement of "[s]uch an analysis would bar plaintiff's recovery as a matter of law, thereby undermining the purpose of this article—to permit partial recovery in cases in which the conduct of each party is culpable" (13th Ann Rep of Jud Conf on CPLR, reprinted in 1975 McKinney's Session Laws of NY at 1477, 1485). Thus, the Conference "expected that the courts will treat assumption of risk as a form of culpable conduct under this article" when applying the comparative negligence regime it proposed (*id.*).[1] As the report further noted, the Legislature employed the term "culpable conduct" rather than "negligent conduct," thus indicating its intent to have juries consider the conduct even of defendants who had acted reasonably (*id.*).

The legislative branch agreed and abolished assumption of risk as a bar to recovery. The Assembly Sponsor of the legislation that included CPLR 1411 explained:

> "[T]he bill would equate the defenses of contributory negligence and assumption of risk under the rubric of 'culpable conduct.' This is consistent with the position taken by the New York courts (*McFarlan v City of Niagara Falls*, 247 NY 340, 349 [1928]). Unless assumption of risk is so treated, it would negate any duty owed by defendant to plaintiff (*see McEvoy v City of New York*, 266 App Div 445, 447 [2d Dept. 1943], *affd* 292 NY 654 [1944]), thus undermining the purpose of the proposed bill, which is to permit partial recovery in cases in which the conduct of each party is culpable" (Sponsor's Mem, Bill Jacket, L 1975, ch 69 at 7; *accord* Mem of Jud Conf on CPLR, Bill Jacket, L 1975, ch 69 at 18; *see also* 13th Ann Rep of Jud Conf on CPLR, reprinted in 1975 McKinney's Session Laws of NY at 1477, 1484 [noting that this interpretation of the provision 'is consistent with the result reached in the vast majority of states that have adopted some form of comparative negligence' "]).

---

[1] At the time, commentators had a similar expectation (*see* 1B Warren's NY Negligence § 2.03, at 1028 [rev 2d ed 1980]).

Finally, in a memorandum to the Governor regarding the legislation, the Attorney General

expressed in plainest terms that "[t]he bill abrogates the common law rules of contributory

negligence and assumption of risk and establishes a rule of so-called 'pure' comparative

negligence" (Mem of Attorney General, Bill Jacket, L 1975, ch 69 at 20).

## II.

### A.

Shortly after the Legislature passed CPLR 1411, the Court, despite the statute's

plain text and legislative history, breathed life into the old contributory negligence tort

regime by resurrecting a vestigial form of implied assumption of risk labeled "primary"

assumption of risk, resulting in a retention of the common-law distinction between implied

and express assumption of risk. Under that framework, a plaintiff who is aware of and

assumes the risks of an activity through their voluntary participation implicitly relieves a

defendant of any duty of care to the plaintiff, while a plaintiff who expressly assumes a

known risk—by, for example, contractually waiving liability—renders the defendant not

liable for a breach of the duty of care (*see Arbegast*, 65 NY2d at 165-166). Put another

way, a defendant owes no duty to a plaintiff who, through their participation, has implicitly

assumed the risk of the activity whereas a defendant is absolved of liability for a breach of their duty of care when a plaintiff expressly assumes the risks.[2]

For policy reasons, the Court has limited the doctrine to participants in professional and recreational sports (*see Trupia*, 14 NY3d at 395). "[T]he assumption of risk to be implied from participation in a sport with awareness of the risk is generally a question of fact for the jury" and "dismissal of a complaint as a matter of law is warranted when on the evidentiary materials before the court no fact issue remains for decision by the trier of fact" (*Maddox*, 66 NY2d at 279). And while the Court has acknowledged the "no-duty" conceptualization of "primary" assumption of risk, the Court has nonetheless imposed on defendants a modified, albeit narrow, duty of care. Specifically, a defendant has "a duty to exercise care to make the conditions as safe as they appear to be" (*Custodi v Town of Amherst*, 20 NY3d 83, 88 [2012]). The Court has also cabined the scope of potential risks assumed by plaintiffs such that "participants are not deemed to have assumed risks resulting from the reckless or intentional conduct of others, or risks that are concealed or unreasonably enhanced" (*id.*).

As I discuss, and as plaintiff Grady contends, CPLR 1411 does not lend itself to this interpretation and we should no longer continue to hold that it does.[3] Moreover, because

---

[2] A defendant moving for summary judgment on this basis need not first "establish[ ] their own exercise of reasonable care" (*Maddox v City of New York*, 66 NY2d 270, 276 [1985]).

[3] Contrary to the view of my dissenting colleague, Judge Singas (*see* dissenting op at 2), Grady's challenge to the Court's prior interpretation of CPLR 1411 is properly before us. Lower courts are bound to follow our rulings since, as the high Court of New York State, we are the only tribunal empowered to overrule our precedents (*see New York Civ. Liberties*

the doctrine leads to results at times difficult to harmonize, and the policy concerns that animated the Court's jurisprudence have proven unfounded, it is time to abolish the last remnant of the contributory fault era embodied in this vestigial "primary" assumption of risk doctrine.

## B.

The Court has elected to overrule prior precedent "only when there is a compelling justification for doing so" (*People v Lopez,* 16 NY3d 375, 384 n 5 [2011], including when departure from stare decisis yields sounder jurisprudence (*People v Peque*, 22 NY3d 168, 194 [2013]; *see also People v Hogan*, 26 NY3d 779, 791 [2016] [Rivera, J., dissenting] ["Stare decisis is not meant to fit the Court like a straightjacket and to prevent mistakes from being rectified"]).  Adherence to precedent is unjustified when: (1) the prior holding "leads to an unworkable rule, or . . . creates more questions than it resolves" (*People v Taylor*, 9 NY3d 129, 149 [2007]); (2) it " 'colli[des] with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience' " (*Hobson,* 39 NY2d at 487, quoting *Helvering v Hallock,* 309 US 106, 119 [1940]); (3) subsequent controlling pronouncements have thrown the precedent into doubt so that it "no longer serves the ends of justice or withstands the cold light of logic and experience" (*Policano v Herbert*, 7 NY3d 588, 604 [2006] [internal quotation marks omitted]; *see also People v Reome*, 15 NY3d,

*Union v New York City Police Dept.*, 148 AD3d 642, 644 [1st Dept 2017], *affd* 32 NY3d 556 [2018] ["(W)e cannot overrule . . . Court of Appeals decisions . . . and are obligated to reverse based on this controlling precedent]). Such a claim is therefore the *ne plus ultra* of "contentions which could not have been so obviated or cured below" and may be raised before us for the first time (*Telaro v Telaro*, 25 NY2d 433, 439 [1969]).

188, 194 [2010]), or, more generally, (4) the precedent has simply been undermined by "the 'lessons of experience and the force of better reasoning' " (*Bing,* 76 NY2d at 338, quoting *Burnet v Coronado Oil & Gas Co.*, 285 US 393, 407-408 [1932, Brandeis, J., dissenting]) such that the prevailing rule has ossified into an "archaic and obsolete doctrine which has lost its touch with reality" (*Hobson*, 39 NY2d at 487).

Critically, where "[l]egislative correction is confined[,] . . . [t]ort cases, but especially personal injury cases, offer another example where courts will, if necessary, more readily re-examine established precedent to achieve the ends of justice in a more modern context" (*id.* at 489). Such follows from the broader principle that "[s]tare decisis does not compel us to follow blindly a court-created rule . . . once we are persuaded that reason and a right sense of justice recommend its change" (*Silver v Great Am. Ins. Co.*, 29 NY2d 356, 363 [1972]). Such change is plainly called for here.

C.

A review of the Court's seminal decisions on assumption of risk confirms that the Court has misapplied CPLR 1411 by retaining a bar to recovery in contravention of the text and the legislature's intent that fact finders apportion liability commensurate with the culpability of each party's conduct. In *Arbegast*, the Court read CPLR 1411 as "requir[ing] diminishment of damages in the case of an implied assumption of risk" (65 NY2d at 170). *Abergast* involved a student teacher who was injured during a donkey basketball game when she fell off the animal at a fund-raising event for the high school's senior class (*id.*

at 162-163).[4] The Court reasoned that CPLR 1411 compares "blameworthy" conduct rather than negligence and thus focuses on "[c]omparative causation" (*id.* at 168). The Court further noted that CPLR 1411 did not define "assumption of risk" and read the term as "requir[ing] diminishment of damages in the case of an implied assumption of risk but, except as public policy proscribes an agreement limiting liability, does not foreclose a complete defense that by express consent of the injured party no duty exists and, therefore, no recovery may be had" (*id.* at 170). Because the plaintiff conceded she was informed before the games began that "participants are at their own risk[,]" she was not entitled to a jury instruction on comparative negligence based on implied assumption of the risk (*id.* at 171). Thus, *Arbegast* dealt only with an "express consent by the plaintiff that no duty exists" which is "a complete defense" (*id.* at 170).

A few months later, the Court applied these principles in *Maddox v City of New York*, which, unlike the plaintiff's express assumption of risk in *Arbegast*, involved an implied assumption of risk based on a plaintiff's knowledge of the inherent risks associated with their conduct (66 NY2d 270 [1985]). There, Elliot Maddox, a professional baseball player for the New York Yankees, sued several defendants—including the City (which owned Shea Stadium), the lessee Metropolitan Baseball Club, Inc., and the stadium's

---

[4] The game is as a basketball game with two teams of four players who "must be astride" atop donkeys "in order to shoot, pass, or play defense" (*see* Katie Thomas, *Donkey Basketball Holds on Despite Criticism*, NY Times, Apr. 17, 2009, *available at* https://www.nytimes.com/2009/04/18/sports/othersports/18donkey.html [retrieved Apr. 3, 2023]). Although the game resulted in injury to the plaintiff, it was no fun for the donkey who had to bear her weight as she commanded it around the "court."

general contractor, architect, and consulting engineer—alleging that the stadium's negligently-designed drainage system caused his left foot to slip as his right foot became stuck in a mud puddle, resulting in a career-ending knee injury (*id.* at 275). The Court concluded that the defendants were entitled to summary judgment because Maddox had conceded that he continued playing in the game "with the knowledge and appreciation of the risk" that caused his injury (*id.* at 276). In reaching this determination, the Court explained that the assumption of the risk doctrine "requires not only knowledge of the injury-causing defect but also appreciation of the resultant risk," which "is not to be determined in a vacuum" (*id.* at 278 [cleaned up]). "[R]ather," the Court continued, that risk must be "assessed against the background of the skill and experience of the particular plaintiff and in that assessment a higher degree of awareness will be imputed to a professional than to one with less than professional experience in the particular sport" (*id.* [cleaned up]).[5] In adopting this approach, the Court joined several other state courts which had "redefined" the doctrine "to allow the notion of assumption of risk to remain a viable defense even with the advent of modern comparative fault concepts" (Alexander J.

_____

[5] The Court acknowledged that the injuries giving rise to *Maddox* occurred before CPLR 1411's passage and that it was thus "at liberty to modify the common-law rules of assumption of risk" but "decline[d] to take that step" (66 NY2d at 277).

Drago, *Assumption of Risk: An Age-Old Defense Still Viable in Sports and Recreation Cases*, 12 Fordham Intell Prop Media & Ent LJ 583 [2002]).[6]

The following year in *Turcotte v Fell*, the Court definitively adopted the "no duty" rationale in another implied consent case (68 NY2d 432, 438 [1986]). Unlike Christy Arbegast, but like Elliot Maddox, the plaintiff in *Turcotte* was a successful professional athlete. Ronald Turcotte had a 17-year career as a jockey, best known for riding Secretariat to the Triple Crown victory in 1973 (*see* 68 NY2d at 435). Five years later during a race at New York's Belmont Park, he suffered a devastating injury when, after being clipped by another jockey he was thrown from his horse. The injury rendered him a paraplegic and ended his racing career (*id.* at 435-436). The Court explained that, because CPLR 1411 abolished assumption of risk as an absolute defense, "it ha[d] become necessary and quite proper, when measuring a defendant's duty to a plaintiff to consider the risks assumed by the plaintiff" because assumption of risk "is simply a confusing way of stating certain no-

---

[6] The Legislature adopted comparative fault at a time when detractors opposed this legislative tort reform. As one commentator observed in 1963, certain "lobby and pressure groups" with economic interests in maintaining contributory negligence regimes "[we]re active and successful in preventing bills incorporating comparative negligence principles from obtaining full legislative consideration" (Cornelius J. Peck, *The Role of the Courts and Legislature in the Reform of Tort Law, 48 Minn L Rev 265, 305 [1963]; see also id. at n 180 [collecting examples of failed comparative-negligence legislation]).* Even some jurists offered reasons for opposing comparative fault (*see e.g. Vincent v Pabst Brewing Co.*, 47 Wis 2d 120, 129, 177 NW2d 513, 517 [1970] [expressing concern that "pure comparative negligence would render defendants the insurers of any who chose to commence an action"]; *see also Alvis v Ribar*, 85 Ill 2d 1, 41, 421 NE2d 886, 904 [1981] [Ryan, J., dissenting] ["Under pure comparative negligence, as adopted by the majority, the injured plaintiff will have the best of both worlds. (They) will be able to recover for (their) injuries without fault and at the same time not be limited in the amount (they) may recover"]). CPLR 1411 reflects our State's rejection of these alarmist views.

duty rules" (*id.* at 438 [internal quotation marks omitted]).  As applied to sporting events, the defendant thus has "a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty" (*id.* at 439). In analyzing "the nature and scope of [the] plaintiff's consent," the Court noted that "[i]t would be a rare thing indeed, if the election of a professional athlete to participate in a sport at which he makes his living could be said to be involuntary" (*id.*). The Court noted that "while the courts ha[d] traditionally exercised great restraint in the belief that 'the law should not place unreasonable burdens on the free and vigorous participation in sports', they ha[d] recognized that organized, athletic competition does not exist in a vacuum" and that "[s]ome 'of the restraints of civilization must accompany every athlete onto the playing field' " (*id.*, citing *Nabozny v Barnhill,* 31 Ill App 3d 212, 214-215, 334 NE2d 258, 260 [Ill App Ct 1975]). "Manifestly," the Court went on to say, "a professional athlete is more aware of the dangers of the activity, and presumably more willing to accept them in exchange for a salary, than is an amateur" (*id.*).

Applying these principles, the Court explained that Turcotte was a professional jockey who knew horse racing was a dangerous activity, involving thoroughbreds that "weigh[ ] half a ton and can reach speeds of 40 miles per hour or more" and that "[j]ockeys weighing between 100 and 120 pounds, attempt to control" the horse while maximizing speed to win (*id.*). Indeed, the plaintiff testified that during a race a horse could lawfully run outside their lane and may come within inches of other speeding horses, bumping one

another (*id.*). "Such dangers[,]" the Court concluded, [we]re inherent in the sport" and since the plaintiff "recognized as such[,] . . . he consented to relieve defendant" of liability (*id.* at 441).

However, the Court drastically expanded this limited carveout for professional athletes to bar recovery for a 19-year-old student football player only three years later in *Benitez v New York City Bd. of Educ.* (73 NY2d 650 [1989]). Plaintiff Sixto Benitez broke his neck during a varsity game. The record established that the plaintiff was playing a "Division A" team even though the coach felt this was unsafe because his "players were fatigued" and he "did not have the personnel to rest [plaintiff] Benitez[,] and was aware that injuries are most likely to occur when players are tired" (*id.* at 654-655). Nevertheless, the coach "did not unilaterally cancel the game because he feared it might cost him his job" (*id.*). The plaintiff testified that he was fatigued when he was injured but did not tell the coach (*id.*). He also had motives to play, namely several pending football scholarship offers (*see id.*). To justify applying the rule to this student player, the Court adopted a type of sliding-scale assessment of physical skill and sports knowledge: "a high school athlete, even an outstanding one, does not assume all the risks of a professional sportsperson, neither does a 19-year-old senior star football player and college scholarship prospect fall within the extra protected class of those warranting strict parental duties of supervision" (*id.* at 657-658).[7]

---

[7] While the Court appears to have responded in part to the trial court's jury instruction that the defendants were required to exercise "the same level of care 'as a parent of ordinary prudence would exercise under the same circumstances[,]' " the Court set a line to be

Notably, the Court stated that "[p]layers who voluntarily join in extracurricular interscholastic sports assume the risks to which their roles expose them but not risks which are unreasonably increased or concealed" (*id.* at 658 [internal quotation marks omitted]). In other words, the Court subjected the plaintiff student to the same standard it had applied

---

affirmed the jury's finding that the plaintiff had only been 30% at fault based on its conclusion that the plaintiff's evidence made a prima facie showing that the defendants were negligent in their "duty to supervise the activities of the students in its charge" (*Benitez v New York City Bd. of Educ.*, 141 AD2d 457, 459 [1st Dept 1988]). Specifically, the Appellate Division reasoned:

> "The evidence here indicates that defendants unreasonably enhanced or increased the risk of plaintiff being injured by playing him in a game between mismatched teams and by playing him for virtually the entire game, while he was tired, because there was no adequate substitute for him. While plaintiff was a voluntary participant in the game, never having complained of being tired, the law does recognize, especially in student-teacher relationships, that a degree of indirect compulsion exists, nonetheless. The rationale is that the student is understandably reluctant to refuse to participate for fear of the negative impact such refusal might have on his or her grade or standing. Such reasoning applies here. Plaintiff was " 'one of the best football players to come out of GW' "; he had a " 'drawer full' " of letters from colleges. In such circumstances, it is not at all surprising nor legally fatal to his cause that plaintiff had not asked to be taken out of the game.
>
> Our analysis of the record reveals sufficient competent evidence which, if accepted, makes out a prima facie case that defendants were negligent in permitting plaintiff to play in a game in which his team was greatly outmatched and in circumstances in which the likelihood of his being injured was significantly enhanced. The question of plaintiff's own negligence was, of course, submitted to the jury, which assessed it at 30%.
>
> Defendant's dire forecast that a finding of liability here will open the floodgates and lead inevitably to the total collapse of the Board of Education's interscholastic sports program is somewhat overstated, to say the least. This is an unusual case, one in which the very incident which occurred was predicted" (*id.* at 459-460 [internal quotation marks omitted]).

to professional athletes. Under that standard, the Court concluded that the defendant had not increased or concealed the risk, which instead was "[w]ithin the breadth and scope of [the plaintiff's] consent and participation" (*id.* at 659). Thus, the "plaintiff put himself at risk in the circumstances of this case for the injuries he ultimately suffered" (*id.*). Eliding the context in which the plaintiff's action arose, the Court opined that the injury "in sum, was a luckless accident arising from the vigorous voluntary participation in competitive interscholastic athletics" (*id.*). But plainly nothing about the plaintiff's presence and play on the field that day was "luckless" or an "accident" (*id.*). Rather, school officials made a choice to pit these students in a close-contact game, against better-prepared, physically-dominant players, despite knowing the high risk of serious injury to plaintiff and his teammates.

In *Morgan v State of New York*, the Court decided four appeals—*Morgan*, *Beck*, *Chimerine*, and *Siegel*—and again drew no legally significant distinction among professional, amateur and recreational sports participants (90 NY2d 471 [1997]). *Morgan* involved "an amateur bobsledder who had competed in the Olympic Games and had been bobsledding at [the site of the injury] for over 10 years prior to the accident" (*id.* at 480). *Beck* involved a 30-year-old orange belt who had been training for over a year at the karate school where the injury occurred (*id.* at 481). *Chimerine* was a relative novice to martial arts, having been injured during her fourth class at the defendants' school (*id.* at 481). In all three cases, the Court concluded that the plaintiffs assumed the risk of the respective sports in which they participated (*see id.* at 486-489). In contrast, the Court determined that

the plaintiff in *Siegel*—a 60-year-old tennis player who tripped over a torn net bisecting the court—had not assumed the risk even though he was aware of the problem for over two years (*id.* at 482). As the Court explained, "[r]elieving an owner or operator of a sporting venue from liability for inherent risk of engaging in a sport is justified when a consenting participant is aware of the risks; has an appreciation of the nature of the risks; and voluntarily assumes the risks" (*id.* at 484). Even though plaintiff Siegel was well aware of the torn net, the Court concluded that "a torn or allegedly damaged or dangerous net is by its nature not automatically an inherent risk of a sport as a matter of law for summary judgment purposes" but "may qualify as and constitute an allegedly negligent condition occurring in the ordinary course of any property's maintenance and may implicate typical comparative negligence principles" (*id.* at 488). But the very fact of the net's placement as a divider of indoor courts illustrates the inherent risk of the indoor version of tennis.

Despite its earlier no-duty assumption of risk rhetoric, the Court repeated the established standard that "for purposes of determining the extent of the threshold duty of care, knowledge plays a role but inherency is the sine qua non" (*id.*, citing *Maddox*, 66 NY2d at 270; *Turcotte*, 66 NY2d at 443; *Scaduto v State of New York*, 56 NY2d 762 [1982], *affg* 86 AD2d 682). The Court reaffirmed that defendants carry a duty because "participants will not be deemed to have assumed the risks of reckless or intentional conduct or concealed or unreasonably increased risks" (*id.* at 485 [internal citations omitted]).

In *Bukowski v Clarkson Univ.*, the Court acknowledged "the injury risks attendant to participation in organized sports" (19 NY3d 353, 355 [2012]), and concluded that a

college student baseball player assumed the risk of being hit by a line drive inherent in an indoor practice without the use of a protective L-screen (*see id.* at 356-358).[8] Rather than treating the lack of a protective net as an "unreasonably increased risk" of the practice, the Court concluded that the "experienced and knowledgeable baseball player" assumed the inherent risk of playing without the protective screen, as well as the "less than optimal" indoor lighting (*id.* at 357). This conclusion is difficult to reconcile with the Court's analysis of the torn net in *Siegel* when, in both cases, the plaintiff was aware of the enhanced risks that the relevant playing conditions presented.

Any semblance of a unifying principle disappeared in *Custodi*, which involved a plaintiff rollerblading in her neighborhood who fell when her skate struck the elevated edge between the defendant's property and the drainage culvert on the street (20 NY3d at 86). The Court acknowledged that "[a] person who engages in [a sports] activity consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and from such participation" and that "[t]he duty owed in these situations is a duty to exercise care to make the conditions as safe as they appear to be" (*id.* at 88 [internal quotation marks omitted]). Nevertheless, the Court concluded that assumption of the risk is "limited to sporting events, sponsored athletic and recreative activities, or athletic and recreational pursuits that take place at designated venues" (*id.* at 89). The plaintiff was not skating in such a venue or a sponsored competition and therefore the doctrine did not

___

[8] As the Court noted in *Bukowski*, "[a]n L-screen is a net strung on a thin, metal frame shaped like a block L that protects pitchers from balls that are batted back at them" (19 NY3d at 358 n *).

bar her potential recovery for damages. The Court explained that extending the doctrine to cases involving streets and sidewalks "would create an unwarranted diminution of the general duty of landowners—both public and private—to maintain their premises in a reasonably safe condition" (*id.*). Again, the Court made a policy choice which cannot be squared with the express language of CPLR 1411 or the legislative intent to apply comparative negligence to all personal injury actions. Moreover, there is no compelling basis for excluding sports venue owners from the general rule that property owners are liable for their negligence. Certainly the owners of Madison Square Garden or the Barclays Center, or for that matter University at Buffalo, can more easily afford insurance than Town of Amherst residential home owners defendants Peter and Susan Muffoletto (*see id.* at 86).[9]

## D.

As this discussion reveals, the Court has constructed a strange judicial artifice that assumption of risk limits the defendant's duty to a plaintiff based on the plaintiff's consent to participate in inherently-risky conduct. Practically, however, the Court has treated assumption of risk as a "principle of no duty" (*Trupia*, 14 NY3d at 395), making passing

---

[9] Judge Singas quotes this language out of context to support a completely different point that, unlike the owners of these professional sports facilities, "many youth programs, especially those serving disadvantaged children, may not be so fortunate" as to be in a position to purchase insurance (dissenting op at 4). Even if that were true, the Court's retention of this doctrine ensures that such children—already burdened with the economically and socially destructive consequences of poverty—who suffer debilitating injuries while engaged in organized sports will remain barred from recovering and be left to fend for themselves (*see e.g. Benitez*, 73 NY2d at 654-655, 659).

reference to the event sponsor or venue owner's minimal duty of care to the participants.

The Court's approach is irreconcilable with the statutory language and the intended goal

of providing a path to recovery for plaintiffs partially responsible for their injury (*see*

*Hobson*, 39 NY2d at 487, 489). As this Court candidly acknowledged in *Trupia*:

> "The reality [] is that the effect of the doctrine's application is often not
> different from that which would have obtained by resort to the complete
> defenses purportedly abandoned with the advent of comparative causation—
> culpable conduct on the part of a defendant causally related to a plaintiff's
> harm is rendered nonactionable by reason of culpable conduct on the
> plaintiff's part that does not entirely account for the complained of harm.
> While it may be theoretically satisfying to view such conduct by a plaintiff
> as signifying consent, in most contexts this is a highly artificial construct and
> all that is actually involved is a result-oriented application of a complete bar
> to recovery. Such a renaissance of contributory negligence replete with all its
> common-law potency is precisely what the comparative negligence statute
> was enacted to avoid" (*Trupia*, 14 NY3d at 395).

Aside from the ends justifying the rule, members of the Court have acknowledged that the

carve-out for sports activities poses its own challenges. As observed by Judge Smith in his

*Trupia* concurrence, the majority's commentary on the implied assumption of risk doctrine

"invite[d] a number of questions[,]" including "What exactly is 'athletic or recreative'

activity?" (*id.* at 397 [Smith, J., concurring]). *Trupia*, Judge Smith noted, involved a child

who was injured after sliding down the banister of a school staircase and though he agreed

that "[a]ssumption of risk [could not] possibly be a defense because it is absurd to say that

a 12-year-old boy 'assumed the risk' that his teachers would fail to supervise him[,]" he

also pointedly asked: (1) why the plaintiff's "chosen activity" was not "recreative" when

"[h]e was obviously doing it for fun[;]" (2) why "sliding down a banister (supposing it to

be done by an adult with a taste for such amusement) of less social value than sliding down

a ski slope or bobsled run[;]" and (3) why, if the athletic and recreative activities recognized in prior cases were "more socially valuable than the former[,] . . . the banister slider, who chose the less desirable form of amusement, [is] in a *better* position to recover damages than the skier or bobsledder" (*id.* [emphasis added]).

Notwithstanding these flaws in reasoning and application, the Court has justified its retention of the doctrine based on its "utility in 'facilitat[ing] free and vigorous participation in athletic activities' " which, the Court determined, "possess enormous social value" (*id.*, quoting *Benitez v New York City Bd. of Educ.*, 73 NY2d 650, 657 [1989] [alterations in original]). The Court has further specified that the doctrine "shields college athletics from potentially crushing liability" (*Bukowski*, 13 NY3d at 358).

Given CPLR 1411's enactment, such value-laden concerns are " 'matters for the judgment of the Legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance' " (*Montgomery v Daniels*, 38 NY2d 41, 53 [1975], quoting *Chicago, B. & Q.R. Co. v McGuire*, 219 US 549, 569 [1911]). In other words, "the province of the courts does not extend to the wisdom, necessity or motivation of legislation" (*Ball v State of New York*, 41 NY2d 617, 625 [1977]). The Court's task then—as it is now—was to apply CPLR 1411 "as it is written by the Legislature, not as the [C]ourt may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise"

(*Parochial Bus Sys., Inc. v Board of Educ. of City of New York*, 60 NY2d 539, 548-49 [1983]).

Indeed, for just this reason legal commentators have been sharply critical of the Court's policy-driven retention of the doctrine in the face of CPLR 1411 (*e.g.* Danielle Clout, Note, *Assumption of Risk in New York: The Time Has Come to Pull the Plug on This Vexatious Doctrine*, 86 St John's L Rev 1051, 1063-1071 [2012] [criticizing the Court's shifting justifications for retaining assumption of risk and undermining CPLR 1411]; Drago, 12 Fordham Intell Prop Media & Ent LJ at 583 [observing that "[t]he distinction between" assumption of risk and contributory negligence, "once largely irrelevant because both completely barred recovery, has been redefined to allow the notion of assumption of risk to remain a viable defense even with the advent of modern comparative fault concepts"]; Gary T. Schwartz, *The Beginning and the Possible End of the Rise of Modern American Tort Law*, 26 Ga L Rev 601, 671-672 [1992] [noting that, "(b)y 1980," assumption of risk "seemed just about extinct: courts disapproved of explicit contractual disclaimers of liability, and courts were inclined to " 'merge' " implied assumption of risk into comparative negligence" and bemoaning this Court's continued invocation of "the concept of assumption of risk to completely deny the defendant's liability"]).

In addition to the Court's interpretive rules meant to restrain the Court from acting in contravention of the legislative will, the Court's 'enormous social value' standard for application of the doctrine is difficult to justify on its own terms, and therefore no longer "withstands the cold light of logic and experience"—assuming it ever did (*Policano*, 7

NY3d at 604). Many socially beneficial nonathletic activities carry inherent risks of injury—for example, operating a motor vehicle—and lawsuits for injuries arising from these activities are evaluated under our comparative fault regime. Further, even if it is logical to hold that a commercially-paid professional athlete has the insight and knowledge born from experience to fully appreciate and voluntarily assume the inherent risks in a sport, it is quite another matter to bar student and amateur athletes, and people enjoying recreational activity from all tort recovery. The Court's policy concern that sporting opportunities will evaporate does not explain the bar to recovery against a for-profit martial arts school in *Morgan* (90 NY2d at 487). Nor, on the flip side, does it explain exempting the residential property owner from injuries incurred by a rollerblader in *Custodi* (20 NY3d at 83). Yet, under those, and the other precedents summarized above, a racecar driver headed to the Riverhead Raceway on Long Island to compete in a race may sue for injuries suffered on the road during the drive to the track, but would be barred from recovering against the track owner for negligently maintaining the venue as soon as their wheels touch the racetrack. Surely, the Legislature did not intend such absurd outcomes when it passed CPLR 1411 (*see Lubonty v U.S. Bank N.A.*, 34 NY3d 250, 255 [2019] ["We must . . . interpret a statute so as to avoid an unreasonable or absurd application of the law"] [internal quotation marks omitted]).

While opportunities for children and adults to engage in physical activities and team athletics is beneficial for participants and has tremendous social value, other jurisdictions with comparative negligence laws have abolished assumption of risk as a complete defense

without seeing an end to youth sports or youth leagues (*see e.g. World Fresh Markets, LLC v Palermo*, 74 VI 455, 469 [2021]; *Rountree v Boise Baseball, LLC*, 154 Idaho 167, 174, 296 P3d 373, 380 [2013]; *Ouachita Wilderness Inst., Inc. v Mergen*, 329 Ark 405, 417, 947 SW2d 780, 786 [1997]; *Auckenthaler v Grundmeyer*, 110 Nev 682, 686, 877 P2d 1039, 1041-1042 [1994]; *Blair v Mount Hood Meadows Dev. Corp.*, 291 Or 293, 297-298, 630 P2d 827, 829-830 [1981]; *Parker v Highland Park, Inc.*, 565 SW2d 512, 517 [Tex 1978]; *Lyons v Redding Const. Co.*, 83 Wash 2d 86, 95, 515 P2d 821, 826 [1973]; *Leavitt v Gillaspie*, 443 P2d 61, 68 [Alaska 1968]; *see also Horton v American Tobacco Co.*, 667 So 2d 1289, 1293 [Miss 1995] [noting that assumption of risk was "subsumed in (Mississippi's) comparative fault doctrine"]).[10] As this list shows, the fear of "potentially crushing liability" on school athletics has no basis in reality (*Bukowski*, 19 NY3d at 358).[11]

---

[10] Equal access to these opportunities has historically been denied to girls and women but, with the passage of Title IX, they now participate in these rewarding activities once reserved only for boys and men (*see McCormick ex rel. McCormick v School Dist. of Mamaroneck*, 370 F3d 275, 286-288 [2d Cir 2004]). No doubt, we all benefit from this sea change in the law and athletics (*see* Alexa Phillippou, *LSU's Morris, SC's Beal, Amihere Declare for 2023 WNBA Draft*, ESPN, Apr. 4, 2023, *available at* https://www.espn.com/wnba/story/_/id/36069258/lsu-morris-sc-beal-amihere-declare 2023-wnba-draft [retrieved Apr. 4, 2023]; Remy Tumin, *N.C.A.A. Women's Tournament Shatters Ratings Record in Final*, NY Times, Apr. 3, 2023, *available at* https://www.nytimes.com/2023/04/03/sports/ncaabasketball/lsu-iowa-womens-tournament-ratings-record.html [retrieved Apr. 4, 2023]).

[11] The majority posits a lack of data showing "that states opting to allow for liability in similar circumstances have not seen any cuts to scholastic sports budgets or even a chilling effect on employment in athletics in decades" as a basis for defending our continued upkeep of the implied assumption of risk doctrine (majority op at 5 n 2). This is no response to the fact that robust opportunities for professional and recreational sports exist in our sister jurisdictions that have adopted comparative fault. Tellingly, the majority points to no data *confirming* the policy concerns repeated throughout our case law. Most importantly,

Moreover, under CPLR 1411's pure comparative fault regime, the trier of fact remains free to consider the risks inherent in the sport when assigning damages based on each party's culpable conduct (*see* CPLR 1411). Thus, liable defendants are not automatically subject to 100 percent of the damages suffered.[12]

Here, plaintiff Grady lost eyesight as a result of an errant baseball thrown toward him during a complex, multi-ball drill that included less-experienced junior varsity players.

---

the legislative history surrounding CPLR 1411 contains no such data. Indeed, one would think that if there were some evidence that pure comparative fault would reduce athletic opportunities in New York the Legislature or, at the very least, the authors of the Judicial Conference Report would have referenced it if they intended to retain assumption of risk in this arena. Instead, the legislative history is silent on the matter. In light of this, I see no basis to reaffirm in these appeals what the Court has recently acknowledged is a "result-oriented application of a complete bar to recovery" (*Trupia*, 14 NY3d at 395).

[12] The majority's observations that "decades of applicable precedent" has reaffirmed the doctrine and that the Legislature "has never sought to correct" the Court's purported misreading of CPLR 1411 is no basis for the Court to ignore its obligation to interpret the law in accordance with applicable rules and principles (majority op at 4, 6). In the past, we have not hesitated to correct our mistaken interpretations of statutes when we have found "the reasons for adopting what we think the correct interpretation of the statute to be more compelling than the reasons for adhering to a mistaken one" (*People v Rudolph*, 21 NY3d 497, 502 [2013], *overruling People v McGowen*, 42 NY2d 905 [1977]; *see also id.* at n *, *citing Reome*, 15 NY3d at 188, *overruling People v Hudson*, 51 NY2d 233 [1980]; *Matter of Hyde*, 15 NY3d 179 [2010], *overruling Matter of Dillon*, 28 NY2d 597 [1971]; *People v Feingold*, 7 NY3d 288 [2006], *overruling People v Register*, 60 NY2d 270 [1983]; *Lusenskas v Axelrod*, 81 NY2d 300 [1993], *overruling Brown v Poritzky*, 30 NY2d 289 [1972]; *People v Levy*, 15 NY2d 159 [1965], *overruling People v Florio*, 301 NY 46 [1950]).

Moreover, when, as here, experience teaches us that a policy driving our case law is unjustified and the corresponding doctrine we have adopted has proven itself unworkable, we have a responsibility to change course, regardless of how much time has passed or whether the Legislature has acted.

Plaintiff Secky was driven into unpadded bleachers, causing an injury to his shoulder that required surgery during his participation in a rebounding basketball drill that the coach testified featured elimination of some boundary lines and the athletic director described as "wall to wall" and "bleacher to bleacher" (i.e., containing *no* boundary lines).[13] In each case, I would reverse the Appellate Division's orders, deny the respective defendants' motions for summary judgment, and remit for trials before fact finders properly-instructed on comparative fault.[14]

### III.

New York courts need not continue applying this "limited vestige of the assumption of risk doctrine" (*Custodi*, 20 NY3d at 87). Even if the doctrine was somewhat defensible

---

[13] Both cases also involve, to differing degrees, classic battles of the experts which, as I have previously cautioned, are particularly unfit for summary judgment given that questions about each expert's methods and conclusions go to their weight, a determination reserved for the finder of fact (*see Nemeth v Brenntag N. Am.*, 38 NY3d 336, 364-365 [2022] [Rivera, J., dissenting]).

[14] The typical content of such instruction is familiar to both the Bench and Bar. Indeed, the New York pattern jury instruction on comparative fault states, in relevant part:

> "If . . . you find that the plaintiff . . . was negligent and that (their) negligence was a substantial factor in bringing about (the accident, injury, [*or other appropriate characterization of the event*]), you must then apportion the fault between the plaintiff (decedent) and the defendant [*and, where appropriate, AB, a third person*].

> "Weighing all the facts and circumstances, you must consider the total fault, that is, the fault of both the plaintiff . . . and the defendant . . . and determine what percentage of fault is chargeable to each. In your verdict, you will state the percentages you find. The total of those percentages must equal one hundred percent" (N.Y. Pattern Jury Instr.—Civil 2:36).

as applied to professional athletes who earn a living assuming risks inherent in a for-profit sporting event, the Court has unwisely expanded the reach of the doctrine to student athletes and recreational sports participants. In so doing, the Court strayed from the foundation of the "primary assumption of risk" rhetoric and tolerated what is, in practice, a complete defense to tortious harm. The way out of this unworkable, results-driven morass is to completely abolish the doctrine and restore the pure comparative fault regime the Legislature intended to establish in 1975 (*Taylor*, 9 NY3d at 149; *Hobson*, 39 NY2d at 489).

The same tools the Court used to create this policy-based judicial protectionism for athletics (*see Turcotte*, 68 NY2d at 437-439) supply us with the means to finally effectuate the Legislature's intent to end contributory negligence and assumption of risk (*see* CPLR 1411). The Court has long emphasized that the common law "must be held no further abrogated than the clear import of the language used in the statutes absolutely requires" (*Bertles v Nunan,* 92 NY 152 [1883]; McKinney's Cons Laws of NY, Book 1, Statutes § 153 ["A change in long established rules of law is not deemed to have been intended by the Legislature in the absence of a clear manifestation of such intent"]).[15]

---

[15] The Court in *Arbegast* purported to heed this maxim, observing that the common law "distinguished between express and implied assumption of risk" and reasoning that, since "[t]he Legislature is presumed to be aware of the decisional and statut[ory] law in existence at the time of an enactment" and "[n]either article 14-A nor its legislative history defines 'assumption of risk[,]' " the Legislature did not abrogate this distinction when it passed CPLR 1411 (65 NY2d at 169-170). That conclusion was wrong. Given the Legislature's cognizance of the existing law, had the Legislature intended to retain the distinction between express and implied assumption of risk, it would have said so explicitly. Instead, the Legislature referred to "assumption of risk" without any qualifiers (CPLR 1411).

Section 1411 easily meets this threshold, as its text and history evince a clear, definite legislative intent to dispense entirely with the assumption of risk doctrine in favor of pure comparative fault (*cf. Xiang Fu He*, 34 NY3d at 171-172 [statute assigning responsibility of clearing icy sidewalks to property owners displaced common-law rule assigning it to the City because the statute's text "could not be clearer"]).

Justice Frankfurter cautioned that "[t]he phrase 'assumption of risk' is an excellent illustration of the extent to which uncritical use of words bedevils the law" (318 US 54, 68 [1943]). We need not continue engaging in "deft legal maneuvering" (*Matter of Brooke S.B. v Elizabeth A.C.C.*, 28 NY3d 1, 26 [2016] [internal quotation marks omitted]) to artificially preserve this doctrine. Rather than continue rendering outcome-driven decisions based on the remnants of a doctrine the Legislature discarded decades ago, we should, as the Legislature intended, abandon the implied assumption of risk doctrine altogether and finally allow the trier of fact to apportion liability amongst culpable parties.

SINGAS, J. (dissenting in *Grady* and concurring in *Secky*):

The majority accurately articulates the well-settled principles governing these cases in section I of its opinion. I note that no party preserved an argument that this Court should disregard this jurisprudence, including proffering any explanation for why stare decisis

should not apply here (*see Bingham v New York City Tr. Auth.*, 99 NY2d 355, 359 [2003] ["in making and shaping the common law—having in mind the doctrine of stare decisis and the value of stability in the law—this Court best serves the litigants and the law by limiting its review to issues that have first been presented to and carefully considered by" the courts below]). The majority also correctly applies our sound law to the facts of *Secky* in section II. I join those sections of the opinion. I dissent in part, however, because the majority misapplies our precedent to the circumstances presented in *Grady* in section III.

The plaintiff in *Grady* was injured when he was hit in the face with a baseball during a high school baseball practice. The majority mistakenly concludes that a jury should determine whether this harm resulted from "an inherent risk" of baseball (majority op at 9). A trial is unnecessary, however, because we have repeatedly made clear that being hit with a mis-thrown ball while playing baseball is a textbook example of a risk "commonly encountered or 'inherent' " in the sport (*Bukowski v Clarkson Univ.*, 19 NY3d 353, 356 [2012]; *see Morgan v State of New York*, 90 NY2d 471, 484 [1997]; *see also* majority op at 9 ["Errant balls may be an inherent risk of playing baseball"]). Indeed, as Chief Judge Cardozo explained, even baseball spectators assume the risk of being hit by waywardly thrown balls (*see Murphy v Steeplechase Amusement Co.*, 250 NY 479, 482 [1929]).

Defendants' evidence demonstrated that plaintiff "accepted personal responsibility" for his injury because it stemmed from an inherent risk of playing baseball—being hit by a mis-thrown ball (*Morgan*, 90 NY2d at 484; *see Bukowski*, 19 NY3d at 356). Further, contrary to the majority's conclusion, the practice drill was as safe as it appeared. No concealed risks existed inasmuch as plaintiff admitted that he thought the drill was unsafe

but participated anyway. Also, the drill did not "unreasonably enhance[ ]" the risks to plaintiff beyond those players typically encounter (*Custodi v Town of Amherst*, 20 NY3d 83, 88 [2012]). The use of multiple balls at a baseball practice is prevalent and inherent to such training sessions. Similarly, use of a protective screen is commonplace at baseball practices. The protective screen here, measuring seven feet high by seven feet wide, certainly was tall and wide enough to provide protection for plaintiff even though it failed to stop the ball that caused his injury. As the Appellate Division stated, "plaintiff was an experienced baseball player who knew of the risks, appreciated their nature[,] and voluntarily assumed them" (190 AD3d 1218, 1220 [3d Dept 2021] [internal quotation marks omitted]). Plaintiff failed to raise a triable issue of fact in response to defendants' showing and, thus, the courts below correctly granted defendants summary judgment.

Plaintiff's injury resulted from "a luckless accident arising from [his] vigorous voluntary participation in competitive interscholastic athletics" (*Benitez v New York City Bd. of Educ.*, 73 NY2d 650, 659 [1989]; *see Bukowski*, 19 NY3d at 358). Despite the unfortunate facts of this case, our precedent requires that we affirm the Appellate Division order.

My colleagues' contrary conclusion misapplies (or advocates abandoning) our precedent, potentially opening the door to liability for, among others, child athlete co-participants, along with community centers and religious institutions that host athletic programs, volunteer coaches, and other people that spend their time creating opportunities for children to participate in athletic and other recreational activities. While owners of professional sports facilities like Citi Field, UBS Arena, and Highmark Stadium "can . . .

easily afford insurance" (Rivera, J., dissenting op at 18), many youth programs, especially those serving disadvantaged children, may not be so fortunate.

For No. 23:
Order reversed, with costs, and defendants' motion for summary judgment denied. Opinion by Judge Garcia. Chief Judge Wilson and Judges Cannataro and Troutman concur. Judge Rivera concurs in result in an opinion. Judge Singas dissents in an opinion. Judge Halligan took no part.

For No. 24:
Order affirmed, with costs. Opinion by Judge Garcia. Chief Judge Wilson and Judges Cannataro and Troutman concur, Judge Singas in a concurring opinion. Judge Rivera dissents in an opinion. Judge Halligan took no part.

Decided April 27, 2023